[Crim. No. 711. Fourth Dist. Sept. 16, 1948.]

THE PEOPLE, Respondent, v. JOHN ARTHUR MARTIN, Appellant.

Harry P. Bowman for Appellant.

Fred N. Howser, Attorney General, and Henry A. Deitz, Deputy Attorney General, for Respondent.

GRIFFIN, Acting P. J.—Defendant was charged with the offense of murdering one Fred Buck. He entered a dual plea of not guilty, and not guilty by reason of insanity. Prior to trial, a doubt arose in the mind of the judge as to the sanity of the defendant. He appointed three alienists to examine him. (See Pen. Code, § 1368.) A trial by jury on this issue was not demanded. Defendant personally and through counsel waived such a trial. At the conclusion of the hearing defendant, on November 19, 1947, was held presently sane; that he was then capable of understanding the nature and object of the proceedings against him and was mentally able to conduct his defense in a rational manner. Thereafter, a trial by

jury on the plea of not guilty resulted in a verdict of guilty of murder in the first degree and life imprisonment was recommended. By the same jury defendant was subsequently found to be sane at the time of the commission of the offense. A motion for new trial was denied. Defendant's counsel then suggested that the court again determine defendant's sanity under section 1368 of the Penal Code before judgment was pronounced. The request was denied. This appeal followed.

The first point raised involves the ruling of the court as to the admissibility of certain evidence in the hearing of November 19, as to the present sanity of defendant. He produced Dr. Cozby, a specialist in neurology and psychiatry. He testified that in his opinion he did not believe defendant was capable of assisting his attorney in his defense because defendant was suffering from a major mental disorder and had so suffered for many years. Counsel for defendant attempted to show the basis for the conclusion of the doctor on direct examination but was advised by the court to leave it for cross-examination.

A medical expert is entitled to express his opinion on a medical question presented in issue and then he may support that opinion by giving the reasons assigned in support of it. (10 Cal.Jur. § 227, p. 970.) Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the facts and the validity of the reasons advanced for the conclusions. (*Estate of Scott*, 1 Cof. 271.)

The weight to be given to the opinion of an expert depends on the reasons he assigns to support that opinion. (*Barker* v. *Gould*, 122 Cal. 240 [54 P. 845]; *Gazzera* v. *City and County of San Francisco*, 70 Cal.App.2d 833, 838 [161 P.2d 806]; *People* v. *Perkins*, 75 Cal.App.2d 875 [171 P.2d 919]; Code Civ. Proc., § 1870, subd. 10.)

On cross-examination both the court and the prosecution went fully into that question and again on redirect examination by defendant's counsel the doctor was permitted to give the basis for his conclusions. Under the circumstances, no prejudicial error resulted.

Defendant's counsel placed defendant's ex-wife on the witness stand. She had not conversed with the defendant for over 15 years. She was called only for the purpose of identifying a copy of the divorce complaint filed by her at that time. The purpose, as stated by counsel for defendant, was to identify an instrument which contained allegations she made therein about defendant's unnatural conduct committed by

him during their married life. The intended use of the instrument was not disclosed. In the absence of some proper showing as to its competency and materiality the ruling of the trial court precluding her from identifying the document was proper.

Counsel contends that he was precluded by the trial court from producing evidence showing that the defendant was, on November 19, suffering from a mental illness affecting his ability to reasonably proceed with his defense; that such illness was of a chronic, progressive and insidious type, first affecting him some 20 years before, and that he could have presented evidence showing a chain of events over that period indicating insanity on his part. The materiality or competency of the evidence suggested cannot be determined from the records before this court. Considerable testimony was produced by both parties as to his present sanity. Although there was a conflict in the evidence, the finding of the court on that subject is adequately supported by the testimony of lay witnesses as well as by medical experts. We perceive no prejudicial error or abuse of discretion in this respect. (*People* v. *Perry,* 14 Cal.2d 387 [94 P.2d 559, 124 A.L.R. 1123].) *People* v. *Vester,* 135 Cal.App. 223 [26 P.2d 685], relied upon by defendant, is factually dissimilar and is not analogous to the instant case.

Defendant owned a radio repair shop in San Diego. He first met deceased in 1945, at a bar where deceased worked as bartender. They had a heated argument, Buck and the proprietor forcibly removed defendant from the barroom. Defendant's arm was broken in the scuffle. He did not speak to Buck for over two years. About 6 p. m. on July 28, 1947, defendant left his shop on Adams Avenue, in the rear of which he had living quarters, and went to a near-by bar. There he saw Buck but did not speak to him. He told his friend Weaver not to mention Buck's name in his presence. He then proceeded to another bar across the street, which was about 450 feet from defendant's radio shop, and sat there drinking some ale. Buck came into that bar where he was working. About 11:30 p. m. Buck and defendant again got into an argument involving the facts pertaining to the removal of the defendant from the bar two years previous, and also pertaining to the arm-breaking incident. Buck started around the bar to put defendant out when Buck's wife came up and separated the two. She asked defendant to leave quietly. He did so but he was angry.

Defendant immediately went to his home and from the bedroom took a .22 caliber rifle from the drawer, loaded it and accidentally discharged the gun. He reloaded it, put on the safety, and walked back to the bar. He stopped at the window in front of it, then raised the rifle and fired through the window in the direction of Buck, who was standing talking to some man. Mrs. Buck saw defendant through the Venetian blinds aiming the gun at them. She warned deceased that defendant had a gun, and about that time a shot was fired. Fragments of the bullet hit Buck in the neck and he later died as a result of the wound. A waitress in the kitchen was also hit by a fragment of the bullet and her arm was injured. Defendant fired a second shot but it apparently went into the air. Immediately thereafter defendant walked down the street. He was later apprehended by some of the occupants of the bar and asked if he knew what he had done. He was told that he had hit Buck and he said: ''Well, I am glad I did,'' and repeated it several times. The officers arrived and defendant stated his story to them. He told them about the same arm-breaking incident two years prior and stated that on this evening he and Buck were arguing about it; that he left the bar, went home, secured the rifle, accidentally fired a shot into the wall at home, went back to the cafe and ''when he arrived at the window outside the bar he withdrew the safety and saw Buck and shot at him; that he fired only one shot because he didn't want to hurt anyone else.'' He told one officer that when Buck admitted in the bar that he was the one who broke his arm two years before, that ''he saw red''; that he went home, got his gun, loaded it, returned to the window of the bar, saw Buck ''and I said to myself 'I will get at least one good shot at you' ''; that he said he then ''took the safety off and fired at him''; that he asked him if he thought he had hit him and he said: ''I should have. I tried to. I am a pretty good shot.'' Defendant also made a written statement in his own handwriting confessing the crime just about as above related and said that he had gone to two or three lawyers and tried to sue Buck for damaging his arm but that the lawyers refused to take the case.

Defendant's counsel now argues that there was no specific intent to kill decedent shown by the evidence, and therefore this court should, under section 1181, subdivision 6 of the Penal Code, reduce the crime to second degree murder or manslaughter, citing *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d

21]; and *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]. He contends that the evidence "preponderantly indicates that the lead bullet passed through the glass and along the pathway virtually intact, except for two or three minute pieces of soft copper which entered the soft tissue of the bartender's throat (claimed 'lost' by the police); that at the time the shot was fired, the victim was standing south of the pathway of the bullet; that the burden rested upon the people to prove beyond a reasonable doubt facts from which it might be rationally inferred that there was, on the part of defendant, a wilful, deliberate and intentional purpose to take the life of the deceased, and that the people failed to meet this burden," citing *People* v. *Thomas,* 25 Cal.2d 880, 900 [156 P.2d 7].

The cases cited by defendant merely require that the deliberation be arrived at or determined as a result of careful thought and weighing of consequences; as a deliberate judgment or plan; and according to a preconceived design. They held that intentional and deliberate homicide is murder in the first degree and that intentional homicide without deliberation is, in the absence of mitigating and exonerating circumstances, murder in the second degree; that in the absence of proof of these elements a verdict of first degree murder cannot stand. It appears to us, from the facts related, that the evidence sufficiently satisfies these requirements and does support the verdict. (*People* v. *Shaver,* 7 Cal.2d 586 [61 P.2d 1170]; *People* v. *Murphy,* 1 Cal.2d 37 [32 P.2d 635]; *People* v. *Cancino,* 10 Cal.2d 223 [73 P.2d 1180]; *People* v. *Ottey,* 5 Cal.2d 714 [56 P.2d 193].)

Defendant next contends the only instruction given by the court concerning manslaughter was that involving voluntary manslaughter. The record does not show that defendant requested such an instruction and we perceive no evidence justifying a verdict of involuntary manslaughter. Under these circumstances defendant cannot claim error. (*People* v. *Cancino, supra*; Pen. Code, § 1105.)

The court gave an instruction that the defendant, as to the plea of not guilty, was conclusively presumed to have been sane at the time of the commission of the alleged offense. Defendant offered some evidence that at the time he committed the act he was not conscious thereof, under subdivision 5 of section 26 of the Penal Code. In this connection the court instructed the jury that if it found that at that time "the conscious mind of the defendant had ceased to operate and that

his actions were solely controlled by his subconscious or subjective mind, . . . then you will find that the defendant . . . did not thereby commit a crime even though such an act would constitute a crime if it had been committed by the defendant when he was conscious."

As we perceive defendant's argument, he contends in his brief that this instruction should have been further qualified, i. e., "If the jury had been told that if defendant, through prior *insanity* was not able at the time of the commission of the act to be sufficiently aware of his surroundings to act and reason as an average man,"—then these facts could be considered in determining whether he had the ability to coolly and deliberately weigh the consequences in determining the degree of the murder. (Italics ours.) In the first place the record does not disclose that defendant offered any such instruction. *People* v. *Malone,* 82 Cal.App.2d 54, 69 [185 P.2d 870] ; and *People* v. *Troche,* 206 Cal. 35, 47 [273 P. 767], preclude such an instruction in reference to insanity. The trial court thoroughly and properly instructed the jury pertaining to the proof required in fixing and determining the degrees of murder. The degree fixed by the jury is supported by the evidence. The defense of insanity is one thing, and the defense of unconsciousness is another. (*People* v. *Cox,* 67 Cal.App.2d 166 [153 P.2d 362].) The jury had adequate instructions on the point presented and decided that defendant was not in a state of unconsciousness at the time the crime was committed. It apparently gave to the testimony of the experts the weight that it thought reasonable. (*People* v. *Freeman,* 61 Cal.App. 2d 110 [142 P.2d 435].) No error appears in this respect.

Defendant earnestly contends that the evidence which he presented at the trial under the plea of not guilty by reason of insanity proved his insanity by a preponderance of the evidence, and the rebutting evidence of the prosecution was insufficient to sustain the verdict. Dr. Cozby again testified on the hearing of this issue. He stated that his numerous examinations of the defendant included the Rorshach test, the Minnesota multibasic personality test, the administration of truth serum or sodium pentathol, as well as confirming facts through intimate acquaintances, and that he thought "that this man was insane . . . and has been insane for twenty years or fifteen years before . . ." This testimony was corroborated by other medical evidence. Thirteen lay witnesses testified concerning certain acts that led them to believe that over a

period of many years defendant had been and was then insane. It was stipulated between counsel that the testimony of the doctors and of the acquaintances and police officers used by the prosecution at the hearing under section 1368 of the Penal Code may be considered as being given under this plea and that if asked whether at the time of the shooting the defendant was able to distinguish right from wrong, their answer would be "yes." It cannot be said that the jury, observing the defendant during the trial, with the entire evidence adduced on the subject, in addition to the presumption that defendant was sane, did not have sufficient evidentiary support for its verdict, although there were many witnesses who testified to the contrary. (See *People* v. *Chamberlain*, 7 Cal.2d 257 [60 P.2d 299] ; *People* v. *Troche*, 206 Cal. 35, 50 [273 P. 767].)

The contention that defendant was prejudiced by reason of the fact that a new jury was not selected to try the issue presented by his plea of not guilty by reason of insanity is disposed of in *People* v. *Willison*, 116 Cal.App. 157, 160 [2 P.2d 543] ; and *People* v. *French*, 12 Cal.2d 720, 765 [87 P.2d 1014].

We see no error in the refusal of the trial court to entertain a motion to again examine defendant under section 1368 of the Penal Code before pronouncing judgment. In this connection Dr. Cozby filed an affidavit containing many of the same allegations contained in his former affidavit together with the facts and conclusions reached and related by him at the trial. He stated that in his opinion the defendant was then and still is medically and legally insane.

Section 1368 of the Penal Code provides in part that "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury. . . ."

In *People* v. *Perry*, 14 Cal.2d 387 [94 P.2d 559, 124 A.L.R. 1123], it was held that where the record on appeal and testimony of the defendant and the written statement made by him show indisputably that he thoroughly understood the nature and object of the proceedings against him and that he was capable of conducting his defense in a rational manner, no error was committed by the trial court in its order denying the defendant's motion that the question of his sanity be determined before pronouncing judgment.

In *People* v. *Lindley*, 26 Cal.2d 780 [161 P.2d 227], it was said that a determination of a motion for hearing on the issue of the defendant's sanity at the time of trial is one which rests within the sound discretion of the court and its denial of the motion will not be disturbed on appeal where there is no abuse of discretion; that the "doubt" mentioned is one that must arise in the mind of the trial judge rather than in the mind of counsel for the defendant or in the mind of any third party. In this determination the trial judge must always be allowed a wide latitude.

Since the affidavit presented attempting to create the doubt was based on facts that had already been heard and determined in the first instance by the trial judge and in the second instance by the jury, and they determined that he was sane at the time and able to properly conduct the defense of his action, no prejudicial error resulted in the denial of this motion.

 Lastly, on a motion for new trial, defendant argues that the jury was illegally separated after it retired to deliberate upon its verdict, contrary to section 1128 of the Penal Code, citing *People* v. *Thornton*, 74 Cal. 482 [16 P. 244]; *People* v. *Hawley*, 111 Cal. 78 [43 P. 404]; *People* v. *Cross*, 64 Cal.App. 443 [221 P. 684].

The affidavit in support of the motion was based on claimed information obtained from six members of the jury, which affidavit stated that as the jury was returning to court from lunch, two or three jurors, just before reaching the stairway, turned and proceeded approximately 10 feet toward the near-by elevator but did not enter it; that the other jurors and the officer sworn to take charge of the jury, started to and did proceed partially up one flight of stairs; that these two or three jurors were brought back from the elevator by the deputy sheriff who was trailing the jury; that the two or three jurors then caught up with the rest of the jury; that the bailiff was in sight of all of the jurors at all times except a possible momentary separation, and no juror held any conversation with any outsider.

In *People* v. *Thornton*, *supra*, the rule was stated to be that if the separation was such that the juror *might* have been improperly *influenced* by others, the verdict should be set aside.

*People* v. *Truesdell*, 124 Cal.App. 360 [12 P.2d 476], analyzes some of the cases relied upon by defendant and holds the rule to be in criminal cases that when a separation of the jurors is shown, the burden rests upon the prosecution to rebut

the presumption of prejudice, but if that presumption is rebutted, the trial court *may* properly deny the application for a new trial based upon such grounds. (See, also, *McDowd* v. *Pig'n Whistle Corp.*, 26 Cal.2d 696, 700 [160 P.2d 797].) In the instant case we see no presumption of prejudice that has not been fairly and sufficiently overcome by evidence.

No new trial should have been granted under the circumstances here related because of such a fleeting separation, where there was a showing that no juror was or might have been improperly influenced by others during the time of separation. (See *People* v. *Murphy*, 92 Cal.App. 729 [268 P. 927]; *People* v. *Nakis*, 184 Cal. 105 [193 P. 92]; *People* v. *Pompa*, 192 Cal. 412 [221 P. 198].)

The judgment and order affirmed.

Mussell, J., concurred.